UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JODI CLAIRE CLARK,<br><br>　　　　　Plaintiff,<br><br>　v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>　　　　　Defendant. | Case No. 1:22-cv-00227-CDB (SS)<br><br>ORDER DENYING PLAINTIFF'S MOTION TO FILE OUT OF TIME REPLY, DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, AND AFFIRMING DECISION OF COMMISSIONER OF SOCIAL SECURITY[1]<br><br>(Docs. 15, 22, 23) |

　　　　Plaintiff Jodi Claire Clark ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying her application for disability benefits under the Social Security Act. (Doc. 1). The matter is currently before the Court on the parties' initial briefs, which were submitted without oral argument, and Plaintiff's request to file an untimely reply. (Docs. 15, 22, 23). Upon review of the Administrative Record ("AR") and the parties' briefs, the Court finds and rules as follows.

**I.　　PLAINTIFF'S MOTION TO FILE OUT OF TIME REPLY**

　　　　On May 23, 2022, the Court entered a scheduling order which, of relevance, provided that

---

[1] Based on the parties' expression of consent, on October 18, 2022, this action was reassigned to a U.S. magistrate judge for all purposes, pursuant to 28 U.S.C. § 636(c)(1). (Doc. 19).

"[w]ithin 15 days after filing of defendant's brief, the plaintiff shall file the optional reply brief." (Doc. 11 at 2). The Commissioner filed his brief on December 20, 2022 (Doc. 22), such that any reply was due on or before January 4, 2023. Almost a year after this deadline, on December 29, 2023, Plaintiff moved "for permission to file out of time and for an extension of time to file her Reply Brief in accordance with Local Rule 261(d)."[2] (Doc. 23 at 1). Plaintiff represents that her "counsel's paralegal entered the due date for Plaintiff's reply into counsel's firm's scheduling software erroneously, setting the date as December 30, 2023 instead of December 30, 2022, in accordance with the firm's policy of setting due dates early." (*Id.*). Plaintiff further represents that "[t]he Commissioner takes no position on this request and defers to the Court's judgment." (*Id.* at 1-2).

Where, as here, an act must be done within a specified time, a "court may, for good cause, extend the time" "on motion made after the time has expired if the party failed to act because of excusable neglect." Fed. R. Civ. P. 6(b)(1)(B). In determining whether delay is due to excusable neglect, the court is to consider the danger of prejudice to the non-moving party, the length of delay and impact upon the proceedings, the reason for the delay including whether it was within the reasonable control of the moving party, and whether the movant acted in good faith. *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. Partnership*, 507 U.S. 380, 395 (1993); *Pincay v. Andrews*, 389 F.3d 853, 855 (9th Cir. 2004).

Here, while Plaintiff provides the reason for the delay, she wholly fails to address the other relevant factors in her two-paragraph motion. (*See* Doc. 23). It is within the Court's discretion to deny the motion based on this failure alone. *See Bateman v. U.S. Postal Service*, 231 F.3d 1220, 1224 (9th Cir. 2000) ("The court would have been within its discretion if it spelled out the equitable test and then concluded that Emeziem had failed to present any evidence relevant to the four factors."). Further, the Court finds the *Pioneer* factors weigh against granting an extension because while there is no indication Plaintiff acted in bad faith or that the

---

[2] Plaintiff's citation to Local Rule 261(d) is confusing given that the Rule's title specifically indicates it applies in "non-social security cases." Further, the scheduling order indicates any requests for modification of the briefing schedule should be made in accordance with Local Rule 144(d). (Doc. 11 at 3).

2

Commissioner would be prejudiced, the Court declines to set a precedent establishing that the negligent calendaring error is sufficient to establish excusable neglect here given the one-year delay was substantial and the reason for the delay was entirely within Plaintiff's counsel's control. *See Hoy v. Yamhill Cnty.*, 693 F. App'x 664, 664 (9th Cir. 2017) (plaintiff's "counsel's failures are attributable to [plaintiff]" in considering *Pioneer* factors) (citing *Pioneer*, 507 U.S. at 396-97); *see also Wystrach v. Ciachurski*, 267 F. App'x 606, 607 (9th Cir. 2008) (affirming district court's determination that "length of delay in responding to [a] motion—more than 100 days—and the reason for the delay—counsel's failure to enter the response deadline in his calendaring system—outweighed the lack of prejudice to defendants caused by the delay and plaintiff's good faith"). Thus, Plaintiff's motion for leave is denied.[3]

## II.   SUBSTANTIVE BACKGROUND

### A. Administrative Proceedings and ALJ's Decision

Plaintiff filed a Title II application for disability insurance benefits on May 31, 2019. (AR 237-38). Plaintiff's application was denied initially and upon reconsideration, and Plaintiff requested a hearing before an administrative law judge ("ALJ"). (AR 107-47, 163-64). On December 4, 2020, ALJ Scot Gulick held a hearing, during which Plaintiff, represented by counsel, and an independent vocational expert testified. (AR 34-67). The ALJ issued his decision on January 26, 2021, finding Plaintiff not disabled. (AR 16-27). On January 5, 2022, the Appeals Council declined Plaintiff's request for review. (AR 1-3).

In his decision, the ALJ engaged in the five-step sequential evaluation process set forth by the Social Security Administration. 20 C.F.R. §§ 404.1520(a), 416.920(a). As an initial matter, the ALJ concluded Plaintiff's date last insured was September 30, 2018, such that she must establish disability on or before that date to be entitled to benefits. (AR 17). At step one, the ALJ found Plaintiff had not engaged in substantial gainful activity between December 31, 2016, the amended alleged onset date, and September 30, 2018. (AR 19). At step two, the ALJ determined

---

[3] However, consideration of the proposed reply would not alter the Court's overall analysis and conclusion that the Commissioner's decision should be affirmed. The reply largely renews arguments Plaintiff advanced in her summary judgment motion, with the exception of a new argument concerning the reasoning level required of the jobs identified by the ALJ at Step Five (Doc. 23-2 at 2) -- an argument that is not responsive to Defendant's opposition and is not properly raised for the first time on reply.

1   that Plaintiff had the following severe impairments: "Carpal tunnel syndrome, small fiber
2   neuropathy, degenerative disc disease of spine with lumbar and cervical radiculopathy,
3   degenerative joint disease and popliteal cysts in the bilateral knees, and depressive disorder with
4   anxious distress."  (AR 19).  At step three, the ALJ found that Plaintiff did not have an
5   impairment, or combination of impairments, that met or medically exceeds the severity of one of
6   the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (AR 19-21).

7   The ALJ determined Plaintiff had the residual functional capacity ("RFC") to perform
8   light work except she was limited to "lifting 20 pounds occasionally and 10 pounds frequently;
9   carrying 20 pounds occasionally and 10 pounds frequently; sitting for 6 hours, standing for 6
10  hours, and walking for 6 hours of an 8 hour day."  (AR 21).  Additionally, the ALJ provided
11  Plaintiff "can handle items frequently with the left hand, and can handle items frequently with the
12  right hand;" "has fingering limitations frequently with the left hand, and has fingering limitations
13  frequently with the right hand;" and "can climb ramps and stairs occasionally, climb ladders,
14  ropes, or scaffolds occasionally, balance frequently, stoop occasionally, kneel occasionally,
15  crouch occasionally, and crawl occasionally."  (AR 21).  As to Plaintiff's mental capabilities, the
16  ALJ found "[s]he is able to perform simple, routine and repetitive tasks but not at a production
17  rate pace, interact with supervisors occasionally, interact with coworkers occasionally, and
18  interact with the public occasionally."  (AR 21-22).

19  In formulating the RFC, the ALJ considered Plaintiff's disability allegations and symptom
20  testimony but concluded her statements concerning the intensity, persistence, and limiting effects
21  of her symptoms were not consistent with the record.  (AR 22).  The ALJ considered the medical
22  record and found the State agency consultants' opinions—which concluded Plaintiff remained
23  capable of performing light work, essentially, with additional nonexertional limitations including
24  frequent handling and fingering bilaterally—"persuasive to the extent they are consistent with the
25  RFC because they are well-supported and generally consistent with the record."  (AR 22-23).
26  Similarly, the ALJ found Dr. Roger Izzi's opinion concerning Plaintiff's mental abilities
27  "persuasive to the extent it is consistent with the RFC because it is well-supported and consistent
28  with the record."  (AR 25).  Specifically, the ALJ referenced Dr. Izzi's conclusion that Plaintiff

4

"could manage her own funds and consistently perform simple and repetitive tasks with moderate social limitations, which is generally consistent with the RFC but not with allegations of additional limitations."  (AR 25 citing AR 1247).

At step four, the ALJ found that Plaintiff was unable to perform any of her past relevant work.  (AR 25).  Finally, at step five, the ALJ found that, per testimony of the vocational expert, Plaintiff could perform jobs that exist in significant numbers in the national economy, such as collator operator, router, and price marker.  (AR 26).  Thus, Plaintiff had not been under a disability from December 31, 2016, through September 30, 2018.  (AR 27).

**B. Medical Record and Hearing Testimony**

The relevant hearing testimony and medical record were reviewed by the Court and will be referenced below as necessary to this Court's decision.

**III.    STANDARD OF REVIEW**

A district court's review of a final decision of the Commissioner of Social Security is governed by 42 U.S.C. § 405(g).  The scope of review under § 405(g) is limited; the Commissioner's decision will be disturbed "only if it is not supported by substantial evidence or is based on legal error."  *Hill v. Astrue*, 698 F.3d 1153, 1158 (9th Cir. 2012).  "Substantial evidence" means "relevant evidence that a reasonable mind might accept as adequate to support a conclusion."  *Id*. at 1159 (quotation and citation omitted).  Stated differently, substantial evidence equates to "more than a mere scintilla[,] but less than a preponderance."  *Id*. (quotation and citation omitted).  In determining whether the standard has been satisfied, a reviewing court must consider the entire record as a whole rather than searching for supporting evidence in isolation.  *Id.*

The court will review only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did not rely.  Social Security Act § 205, 42 U.S.C. § 405(g).  In reviewing a denial of benefits, a district court may not substitute its judgment for that of the Commissioner.  "The court will uphold the ALJ's conclusion when the evidence is susceptible to more than one rational interpretation."  *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008).  Further, a district court will not reverse an ALJ's decision on account

5

of an error that is harmless. *Id.* An error is harmless where it is "inconsequential to the [ALJ's] ultimate nondisability determination." *Id.* (quotation and citation omitted). The party appealing the ALJ's decision generally bears the burden of establishing that it was harmed. *Shinseki v. Sanders*, 556 U.S. 396, 409-10 (2009).

A claimant must satisfy two conditions to be considered "disabled" and eligible for benefits within the meaning of the Social Security Act. First, the claimant must be "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). Second, the claimant's impairment must be "of such severity that he is not only unable to do his previous work[,] but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has established a five-step sequential analysis to determine whether a claimant satisfies the above criteria. *See* 20 C.F.R. § 404.1520(a)(4)(i)-(v); 20 C.F.R. § 416.920(a)(4)(i)-(v). At step one, the Commissioner considers the claimant's work activity. 20 C.F.R. § 404.1520(a)(4)(i); 20 C.F.R. § 416.920(a)(4)(i). If the claimant is engaged in "substantial gainful activity," the Commissioner must find that the claimant is not disabled. 20 C.F.R. § 404.1520(b); 20 C.F.R. § 416.920(b).

If the claimant is not engaged in substantial gainful activity, the analysis proceeds to step two. At this step, the Commissioner considers the severity of the claimant's impairment. 20 C.F.R. § 404.1520(a)(4)(ii); 20 C.F.R. § 416.920(a)(4)(ii). If the claimant suffers from "any impairment or combination of impairments which significantly limits [his or her] physical or mental ability to do basic work activities," the analysis proceeds to step three. 20 C.F.R. § 404.1520(c); 20 C.F.R. § 416.920(c). If the claimant's impairment does not satisfy this severity threshold, however, the Commissioner must find that the claimant is not disabled. 20 C.F.R. § 404.1520(c); 20 C.F.R. § 416.920(c).

At step three, the Commissioner compares the claimant's impairment to impairments

recognized by the Commissioner to be so severe as to preclude a person from engaging in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(iii); 20 C.F.R. § 416.920(a)(4)(iii). If the impairment is as severe or more severe than one of the enumerated impairments, the Commissioner must find the claimant disabled and award benefits. 20 C.F.R. § 404.1520(d);20 C.F.R. § 416.920(d).

If the severity of the claimant's impairment does not meet or exceed the severity of the enumerated impairments, the Commissioner must pause to assess the claimant's "residual functional capacity." Residual functional capacity (RFC), defined generally as the claimant's ability to perform physical and mental work activities on a sustained basis despite his or her limitations (20 C.F.R. § 404.1545(a)(1); 20 C.F.R. § 416.945(a)(1)), is relevant to both the fourth and fifth steps of the analysis.

At step four, the Commissioner considers whether, in view of the claimant's RFC, the claimant is capable of performing work that he or she has performed in the past (past relevant work). 20 C.F.R. § 404.1520(a)(4)(iv); 20 C.F.R. § 416.920(a)(4)(iv). If the claimant is capable of performing past relevant work, the Commissioner must find that the claimant is not disabled. 20 C.F.R. § 404.1520(f); 20 C.F.R. § 416.920(f). If the claimant is incapable of performing such work, the analysis proceeds to step five.

At step five, the Commissioner considers whether, in view of the claimant's RFC, the claimant is capable of performing other work in the national economy. 20 C.F.R. § 404.1520(a)(4)(v); 20 C.F.R. § 416.920(a)(4)(v). In making this determination, the Commissioner must also consider vocational factors such as the claimant's age, education, and past work experience. 20 C.F.R. § 404.1520(a)(4)(v); 20 C.F.R. § 416.920(a)(4)(v). If the claimant is capable of adjusting to other work, the Commissioner must find that the claimant is not disabled. 20 C.F.R. § 404.1520(g)(1); 20 C.F.R. § 416.920(g)(1). If the claimant is not capable of adjusting to other work, the analysis concludes with a finding that the claimant is disabled and is therefore entitled to benefits. 20 C.F.R. § 404.1520(g)(1); 20 C.F.R. § 416.920(g)(1).

The claimant bears the burden of proof at steps one through four above. *Tackett v. Apfel*,

1  180 F.3d 1094, 1098 (9th Cir. 1999).  If the analysis proceeds to step five, the burden shifts to the
2  Commissioner to establish that (1) the claimant is capable of performing other work; and (2) such
3  work "exists in significant numbers in the national economy."  20 C.F.R. § 416.960(c)(2); *Beltran*
4  *v. Astrue*, 700 F.3d 386, 389 (9th Cir. 2012).

**IV.  ISSUES AND ANALYSIS**

In seeking judicial review of the Commissioner's final decision denying her application, Plaintiff raises the following issues:

1. The ALJ failed to adequately develop the record with mental health opinion evidence in light of the significant test results from the consultative examination that remained unexplained. (Doc. 15-1 at 1).

2. The ALJ failed to adequately develop the record with physical health opinion evidence in light of the ambiguity in the onset of her right S1 nerve root displacement.  (*Id.*).

**A. Whether the ALJ Failed to Develop the Record Concerning Plaintiff's Mental Impairments**

Plaintiff's first argument is that a "gap" in Dr. Izzi's opinion triggered the ALJ's duty to further develop the record.  Plaintiff's challenge concerns the report from an October 8, 2019 psychological evaluation by Dr. Izzi.  (AR 1244).  As part of the evaluation, Dr. Izzi administered the Wechsler Adult Intelligence Scale-IV ("WAIS-IV") and Wechsler Memory Scale-IV ("WMS-IV").  (AR 1246).  (AR 1246).  Dr. Izzi indicated Plaintiff's WAIS-IV results suggested her "present level of intellectual functioning [was] within the Borderline Range to Average Range" with subtest scores ranging from the "Extremely Low Range to Average Range."  (AR 1246). Additionally, Plaintiff was "able to recall six digits forward and four digits backward."  (AR 1246).  As to the WMS-IV results, Dr. Izzi observed that the "test results suggest deficits in memory functions."  (AR 1247).

In providing a functional assessment, Dr. Izzi explained:

> The results of limited psychological testing have been discussed in detail in a previous section. The available medical records were reviewed. There were no objective medical records available for review that would support the claimant's subjective complaints. Clinical interview finds the claimant reporting with a complex

8

> medical history, which would be best addressed by the appropriate medical specialist. chronic pain is a predominant feature. His [sic] mood disorder will fluctuate as her subjective perception of pain fluctuates. There is likely to be some depression secondary to her awareness of loss of functional ability.
>
> Clinical interview indicates that the claimant is not having any difficulty caring for basic hygiene. The present evaluation suggests that the claimant does appear capable of performing a simple and repetitive type task on a consistent basis over an eight-hour period. Her ability to get along with peers or be supervised in work-like setting would be moderately limited. The claimant's mood disorder can be expected to fluctuate. Any significant fluctuation of mood may limit the claimant's ability to perform a complex task on a consistent basis over an eight-hour period. On a purely psychological basis, the claimant appears capable of responding to usual work session situations regarding attendance and safety issues. On a purely psychological basis, the claimant appears capable of dealing with changes in a routine work setting.

(AR 1247). Dr. Izzi also indicated Plaintiff appeared "capable of managing her own funds, as suggested by the WAIS-IV results." (AR 1247). The ALJ found Dr. Izzi's opinion "persuasive to the extent it is consistent with the RFC," which included limitations to "simple, routine and repetitive tasks but not at a production rate pace" and only occasional interaction with supervisors, coworkers, and the public. (AR 21-22, 25).

Plaintiff argues "the ALJ only used Dr. Izzi's opinion to inform [his] interpretation of the record evidence (as to mental health)" but "Dr. Izzi's opinion contains an apparent gap, for which the ALJ needed clarification before finding an RFC capable of support by substantial evidence." (Doc. 15-1 at 5). Plaintiff points to her performance on the WMS-IV and asserts that Dr. Izzi "never indicated what functional consequences, if any, resulted from [Plaintiff's] rather severe deficits." (*Id.* at 6). Thus, Plaintiff's position is that the ALJ should have sought an opinion clarifying the impact of Plaintiff's low WMS-IV scores. (*Id.* at 7).

The Commissioner responds that "Plaintiff provides no meaningful explanation for why the Court should second-guess Dr. Izzi's assessment of his own examination findings and then use that to find that the ALJ erred." (Doc. 22 at 5). Further, the Commissioner argues that contrary to Plaintiff's argument that the "ALJ's failure to develop the record harmed her because she testified that she had 'memory issues,'" "[t]he only work-related 'memory issues' Plaintiff testified to involved trouble concentrating or focusing, and being late because she lost track of

time." (*Id.*). Thus, the Commissioner's position is that "[t]here was no evidentiary gap to fill, Plaintiff was not harmed, and so the Court should affirm."[4] (*Id.*).

Generally, "[t]he claimant has the burden of proving that she is disabled." *Smolen v. Chater*, 80 F.3d 1273, 1288 (9th Cir. 1996). However, "[t]he ALJ always has a 'special duty to fully and fairly develop the record and to assure that the claimant's interests are considered … even when the claimant is represented by counsel.'" *Celaya v. Halter*, 332 F.3d 1177, 1183 (9th Cir. 2003) (quoting *Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir. 1983)). Further, "[w]hen a claimant is not represented by counsel, this responsibility is heightened." *Id.* This is because "Social Security proceedings are inquisitorial rather than adversarial." *Schiaffino v. Saul*, 799 F. App'x 473, 476 (9th Cir. 2020) (quoting *Sims v. Apfel*, 530 U.S. 103, 111-12 (2000)). In particular, the ALJ's duty to develop the record is heightened where the claimant may be mentally ill and thus unable to protect her own interests. *Tonapetyan v. Halter*, 242 F.3d 1133, 1150 (9th Cir. 2001) (citing *Higbee v. Sullivan*, 975 F.2d 558, 561 (9th Cir. 1992)).

Nevertheless, "[a]n ALJ's duty to develop the record further is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." *Mayes v. Massanari*, 276 F.3d 453, 459-60 (9th Cir. 2001); *Bayliss v. Barnhart*, 427 F.3d 1211, 1217 (9th Cir. 2005) (citing 20 C.F.R. §§ 404.1512(e), 416.912(e)); *see Brown v. Berryhill*, 697 F. App'x 548, 549 (9th Cir. 2017) ("Because the record evidence was not ambiguous and the record was sufficient to allow for proper evaluation of the evidence, the ALJ was not required to re-contact Brown's doctors or further develop the record.").

Based on a review of the record, the Court determines the ALJ here did not have a duty to develop the record further. The evidence was not ambiguous or inadequate for proper evaluation of Plaintiff's mental abilities. Contrary to Plaintiff's argument, there was no "gap" in Dr. Izzi's

---

[4] In her proposed reply, Plaintiff argues that neither Dr. Izzi's opinion nor the ALJ's decision offer meaningful analysis of the impact of the WMS-IV results showing significant memory deficits on her abilities. (Doc. 23-2 at 1-2). Plaintiff also argues, for the first time, that "there is further harm" because "[a]ll of the jobs, which the ALJ found to be available at Step Five, require a GED Reasoning Level of 2, which denotes a job, wherein the employee will, '[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions.'" (*Id.* at 2). Consideration of these arguments would not alter the Court's analysis or conclusion that the ALJ did not err in failing to further develop the record.

opinion because such set forth the relevant test results; explained that the results indicated Plaintiff's intellectual functioning was within the "Borderline Range to Average Range" and she had "deficits in memory functions;" and concluded such supported that Plaintiff would be moderately limited in her social interactions at work and should be limited to simple, repetitive type tasks. (AR 1247). The ALJ relied on the test results as interpreted by Dr. Izzi and adopted the corresponding functional limitations from the opinion. (*See* AR 23-25). Thus, substantial evidence supports the ALJ's decision, and he had no duty to further develop the record.

**B. Whether the ALJ Failed to Develop the Record Concerning Plaintiff's S1 Nerve Root Displacement**

Plaintiff next argues the ALJ also failed to develop the record concerning her physical health. While Plaintiff words the second issue as challenging the ALJ's failure to develop the record regarding her physical abilities, the actual arguments advanced indicate she is challenging whether substantial evidence supports the ALJ's determination that the State agency medical opinions were consistent with the record. (*See* Doc. 15-1 at 8 ("The ALJ's analysis is flawed, and this materially tainted his consistency analysis for the opinion evidence, leaving the RFC without the support of substantial evidence."); *see id.* at 9 ("These misevaluations are harmful as the ALJ explicitly relied on the imaging and electrodiagnostic testing to find the PAMFs to be consistent under 20 C.F.R. § 404.1520c(c)(2)."). An ALJ is required to "articulate how [he] considered the medical opinions and prior administrative medical findings" in adjudicating a claim, with the consistency and supportability of the opinion being the most important factors. 20 C.F.R. § 404.1520c(a). "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(2).

Here, after a review of the medical records, the State agency medical consultants opined that Plaintiff could perform light work except that she could only occasionally lift or carry 20 pounds; frequently lift or carry 10 pounds; sit for 6 hours in an 8-hour workday; stand and/or walk 6 hours in an 8-hour workday; occasionally climb ramps, stairs, ladders, ropes, and

scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; and frequently handle and finger bilaterally. (AR 123-24, 142-43). As explanation for these limitations, the opinions indicated the record revealed "intermittent C-spine abnls w/o recent abnls, L-Spine and b/l hip abnls throughout more recent exams" and normal gait throughout. (AR 124, 143). The ALJ found these opinions persuasive, noting that they were "consistent with the record, including X-rays and MRIs, electrodiagnostic testing, the claimant's conservative treatment history prior to the date last insured, and clinical signs found throughout the record, including findings of normal gait." (AR 24).

Based on a footnote where "the ALJ commented that imaging from February 13, 2020 identified 'right S1 nerve root' displacement, that this finding occurred nearly 18 months after the date last insured, and that there is insufficient evidence prior to the date last insured to presume this was present before that date," Plaintiff argues the ALJ's analysis of the 2020 MRI, an earlier May 16, 2018 MRI, and a 2017 electrodiagnostic test was "flawed, and this materially tainted his consistency analysis for the opinion evidence, leaving the RFC without the support of substantial evidence." (Doc. 15-1 at 8). As to the MRIs, Plaintiff argues that the images "do not show progression of Plaintiff's issue" but rather "show consistent results" since one is from the period at issue and the other is from a period after Plaintiff was found disabled on a separate application. (*Id.* at 8-9). Plaintiff also argues "the ALJ's layperson valuation of the electrodiagnostic testing appears to have been too great" because although the testing "showed no radiculopathy," doctors continued "to assess a primary diagnosis of lumbar radiculopathy" and prescribe Norco based on Plaintiff's symptomology reports. (*Id.* at 9). Plaintiff's position is that these "misevaluations are harmful as the ALJ explicitly relied on the imaging and electrodiagnostic testing" in addressing the consistency of the State agency medical opinions. (*Id.* at 9-10).

The Commissioner responds that "the S1 nerve root compression did not appear until long after Plaintiff's date last insured, so it was reasonable for the ALJ to determine that it was not present in the four months following the initial MRI" and "Plaintiff's alternative view of the evidence proves nothing." (Doc. 22 at 6). As to the electrodiagnostic testing, the Commissioner asserts that the ALJ accurately summarized the findings and "did not question that Plaintiff had

12

lumbar radiculopathy" because he concluded such was a severe impairment. (*Id.*). Thus, the Commissioner argues the ALJ did not err in considering this evidence but, even if he did, Plaintiff was not harmed because "[t]he MRI and electrodiagnostic findings were not the only, or even the majority, of the evidence the ALJ found consistent with the prior administrative medical findings, which included other imagining findings, Plaintiff's conservative treatment history, and unremarkable clinical examination findings."[5] (*Id.* at 6-7).

Based on the ALJ's discussion of the record and articulation of his treatment of the State agency medical opinions, the Court finds no reversible error. The ALJ correctly noted the "2017 electrodiagnostic testing was 'normal' with no evidence of large fiber peripheral neuropathy, lumbar radiculopathy, or any other nerve entrapment neuropathies." (AR 23). This is an accurate summary of the cited record, which indicates: "Normal bilateral lower needle EMG and nerve conduction study; there is no electrodiagnostic evidence of large fiber peripheral polyneuropathy, lumbar radiculopathy, or any other nerve entrapment neuropathies on this study." (AR 1116). Contrary to Plaintiff's assertion that the ALJ placed too great a weight on this study, the ALJ's discussion shows that the lack of objective evidence to support neuropathy was just one factor the ALJ considered in determining the State agency opinions were consistent with the record. The ALJ also cited the "X-rays and MRIs, … the claimant's conservative treatment history prior to the date last insured, and clinical signs found throughout the record, including findings of normal gait." (AR 24).

Critically, as Plaintiff indicates in her proposed reply, the specific 2018 and 2020 MRIs she referenced in her initial brief were incorrectly included in the record as they involve a patient other than Plaintiff. (*See* AR 1370-92). Because these MRIs are not specific to the Plaintiff, they certainly cannot alone amount to substantial evidence to support the ALJ's decision. However, the ALJ only specifically discussed these MRIs in concluding there was insufficient evidence to support a S1 nerve root displacement was present as of the date last insured, a conclusion that is

---

[5] In her proposed reply, Plaintiff asserts "[t]he ALJ did not provide a sufficiently detailed and accurate analysis of the prior administrative medical findings to support the ALJ's reliance on them." (Doc. 23-2 at 3). Consideration of the proposed reply would not alter the Court's analysis or conclusion.

still accurate given Plaintiff fails to cite any evidence supporting she *ever* experienced a S1 nerve root displacement.  While the ALJ also included a citation to the 2018 MRI in a string cite, the preceding discussion discussed x-rays of the spine but MRIs of the knees.  (*See* AR 23).  The additional citations point to imaging results showing "[m]ild degenerative spurring and mildly straightened lordosis" and "[n]ormal thoracic spine exam" with "[n]o significant degenerative intervertebral disk changes, no overt fractures or spinal cord abnormalities."  (*See* AR 23, citing AR 611, 774).  Considering the additional evidence the ALJ cited, any reliance on the improperly included MRIs amounted to harmless error.  *See Hamm v. Saul*, 804 F. App'x 810, 811 (9th Cir. 2020) (affirming ALJ decision because "even assuming the other reasons proffered by the ALJ for rejecting [provider's] opinions were erroneous, any error would be 'inconsequential to the ultimate nondisability determination' because the ALJ offered specific and legitimate reasons for rejecting the opinions") (quoting *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012)).

Overall, the ALJ properly articulated his conclusion that the State agency opinions were consistent with the record and substantial evidence other than the improperly included MRIs supports that conclusion.  Accordingly, no reversible error occurred.

**V.    CONCLUSION AND ORDER**

For the reasons stated above, the Court ORDERS as follows:

1. Plaintiff's motion to file an out of time reply (Doc. 20) is DENIED;
2. Plaintiff's  motion for summary judgment (Doc. 15) is DENIED;
3. The decision of the Commissioner is affirmed; and
4. The Clerk of Court shall enter judgment in favor of Defendant, terminate any deadlines, and close this case.

IT IS SO ORDERED.

Dated:   **June 5, 2025**

UNITED STATES MAGISTRATE JUDGE